UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RUTH M. LANGFORD, | ) | CASE NO. 04-12447C-7 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| TONIA LYNN LOWERY, | ) | CASE NO. 04-83012C-7 |
| | ) | |
| Debtor. | ) | |

<u>MEMORANDUM OPINION</u>

These cases are before the Court on motions filed by the United States Bankruptcy Administrator (the "BA") to determine the propriety of petition preparer services and fees provided by Charlie Anderson, Clarence D. Smith, Jr., Marilyn L. Jones, and We the People Forms and Service Centers USA, Inc.[1] (collectively "WTP"). The Attorney General of North Carolina intervened in the BA's motions.

The Court held two days of hearings in these cases on June 9, 2005, and July 20, 2005, in Durham, North Carolina, after which the

---

[1] The BA had filed the motions against the following additional parties: We The People Document Services, We The People of Raleigh, NC, Inc., and We The People USA. In the BA's post-hearing brief, however, the BA only alleged Messrs. Anderson, Smith, Ms. Jones, and We The People Forms and Service Centers USA, Inc., are bankruptcy petition preparers. Consequently, the BA allegations against the additional parties is deemed abandoned. <u>E.g.</u>, <u>KPMG, LLP v. SEC</u>, 289 F.3d 109, 120 (D.C. Cir. 2002) ("An argument cannot be merely intimated or hinted at to be raised; it must be 'pressed' to be preserved.").

Court took the BA's motions under advisement and directed the parties to file post-hearing briefs. For the reasons stated herein, the Court will certify numerous facts to the district court for further proceedings pursuant to section 110(i) of the Bankruptcy Code.

BACKGROUND

Charlie Anderson purchased a We The People franchise (the "Store") in March 2002 from We The People Forms & Service Centers USA, Inc. (the "Franchisor"). Mr. Anderson operated the Store in Raleigh, North Carolina, and he initially sold his bankruptcy petition preparer services for $199. On September 30, 2002, however, Bankruptcy Judge A. Thomas Small in the Eastern District of North Carolina issued an opinion finding that the $199 fee was excessive and ruled that the reasonable value of Mr. Anderson's bankruptcy petition preparer services was $80. In re Moore, 283 B.R. 852, 859 (Bankr. E.D.N.C. 2002). Thereafter, Mr. Anderson began selling his bankruptcy petition preparer services for $80 to Store customers that filed in the Eastern District of North Carolina. After speaking with the BA, Mr. Anderson believed that he had reached an agreement to sell those same services for $150 to Store customers that filed in the Middle District of North Carolina. Consequently, when Mr. Anderson supplied the Store's schedule of fees, telephone number, and address to an advertisement prepared by the Franchisor, those advertisements reflected the

2

$80/$150 difference in pricing.[2]   One of the themes of that advertisement was, "No lawyers save money."

On June 14, 2004, Tonia Lynn Lowery came to the Store and purchased the Store's petition preparer services for $150.   Mr. Anderson gave her a Customer Information Workbook ("Workbook"), which contained questions for Ms. Lowery to answer regarding her assets, liabilities, and financial affairs.   In addition, Ms. Lowery received the North Carolina Step By Step Guide to the Bankruptcy Workbook ("Guide"), which provided a set of definitions of terms used in the Workbook, and which provided information and examples on how to complete the Workbook.  Ms. Lowery also received the Bankruptcy Overview - Chapter 7 North Carolina ("Overview"), which provided general information about the bankruptcy process, common questions asked at the meeting of creditors, a list of the North Carolina exemption statutes, and answers to frequently asked questions about bankruptcy.  Ms. Lowery took her Workbook home to complete all the necessary information and did not return it to the Store until July 12, 2004.  Ms. Lowery testified that she filled out the Workbook by relying on the Guide and the Overview as the "bible."

While Ms. Lowery was in the process of completing her Workbook, Mr. Anderson sold his We The People franchise.   Pursuant

---

[2] That advertisement ran 2,173 times from August 1, 2004 to March 27, 2005.  Neither of the debtors in these cases were aware of the advertisements.

3

to the sale's terms, Mr. Anderson and his wife retained a 50%
ownership interest in the franchise, with the remaining portion
being owned by Ira Distenfield, who formed We The People of Raleigh
NC, Inc., to hold the franchise.  Mr. Anderson did not retain any
management role in the new company.  Derek Distenfield, the senior
vice president of the Franchisor, hired Clarence Dupre Smith, Jr.,
to manage the Store.  The transfer was effective on July 1, 2004,
but Mr. Anderson remained at the Store for about two weeks to help
train  Mr. Smith.[3]

When Ms. Lowery brought her paperwork back to the Store on
July 12, 2004, she met with both Mr. Anderson and Mr. Smith, who
reviewed her Workbook for legibility, accuracy, and completeness.
Ms. Lowery was concerned that she might lose rental property that
she owned by filing bankruptcy and she attempted to elicit answers
from Messrs. Anderson and Smith on what would happen to her
property if she filed.  Mr. Anderson informed her, however, that he
could not give legal advice and he generally referred her to the

---

[3] Mr. Smith also attended four days of conference training in
New York where bankruptcy topics were covered.  He testified that
his petition preparer training consisted of: how to greet
customers, how to fill out the customer agreement, giving copies of
documents to the customer, giving the customer a receipt, having
the customer complete the workbook at home, proofreading the
completed workbook, sending the workbook to the processing
department, proofreading the typed documents, and having the
customer pick-up the documents from the Store for filing.  Mr.
Smith testified that he does not use either the Guide or the
Overview; rather, he gives Store customers a bankruptcy pamphlet
prepared by the Administrative Office of the United States Courts.

Guide and Overview for answers without making any specific page references.[4]

After reviewing the Workbook, Messrs. Anderson and Smith sent it to the Franchisor for transcription and typing onto the Official Bankruptcy Forms. Marilyn L. Jones was the transcriber and typist. Ms. Jones, however, did not accurately transcribe and type Ms. Lowery's handwritten information. On page 41 of her Workbook, Ms. Lowery stated that she had paid the Store $150 to prepare her petition. When Ms. Lowery returned on September 3, 2005, to pick up her completed paperwork from Mr. Smith, that $150 figure had been marked through and $80 had been handwritten in its place. Like her Workbook, the Official Forms also stated that she had only paid the Store $80. Ms. Lowery noticed the difference but did not raise the issue with Mr. Smith. After Mr. Smith went over the bankruptcy petition with her, Mr. Smith signed and dated his signature as the bankruptcy petition preparer where appropriate. Ms. Jones had already added her name as a bankruptcy petition preparer, but she had neglected to add the date next to her signature. Because the line for the date was blank, Mr. Smith placed the current date next to Ms. Jones's name on her behalf.

Similar to Ms. Lowery, Ms. Langford purchased the Store's

---

[4] Ms. Lowery attempted to claim her rental property as an exempt homestead. At the meeting of creditors she learned that it was not an appropriate claim of exemption; however, Ms. Lowery testified that because there was little or no equity in the rental property, the trustee was not willing to administer it.

petition preparer services on June 15, 2004, from Mr. Anderson for $150.  After going through a process similar to that of Ms. Lowery, Ms. Langford filed her bankruptcy case.  Ms. Langford's Workbook was also altered to state that she paid only $80 for petition preparer services and her bankruptcy filing also reflects that she paid $80.  Mr. Smith also placed the date next to Ms. Jones's bankruptcy petition preparer signature.

Mr. Anderson attempted to explain the reason behind the $80/$150 discrepancy between what was charged Mses. Lowery and Langford and what was stated to have been charged.  After each paid $150 for the Store's bankruptcy petition preparer services in June 2004, Mr. Anderson learned in early July 2004 – for the first time – that this Court had issued a memorandum opinion and order in earlier litigation between Mr. Anderson, the BA, and the North Carolina Attorney General's Office in the case of In re Graham, No. 02-81930, 2004 Bankr. LEXIS 1678 (Bankr. M.D.N.C. Feb. 10, 2004), aff'd No. 04-00796 (M.D.N.C. April 14, 2005).  In that case the Court ruled that the $150 charged for petition preparer services was excessive and that the reasonable value of such services was akin to what a professional typist would charge, which did not exceed $80 in the case before the Court.[5]  Mr. Anderson learned of that decision when Mr. Distenfield was present at the Store helping

---

[5] The Court also ordered Mr. Anderson to pay $1,000 in fines. The BA alleges that Mr. Anderson did not pay those fines until July 2005.

to train Mr. Smith, and Mr. Anderson stated that a policy decision was made to only charge $80 for bankruptcies in the Middle District of North Carolina.  Mr. Anderson called Ms. Jones, the typist that worked for the Franchisor, to tell her about the Court's decision.  While Mr. Anderson did not refer to any specific customers, that telephone conversation took place after Mses. Lowery and Langford had paid their $150 purchase price and before the Franchisor sent their typed and transcribed information back to the Store for review.

Understanding that the Store might have a problem with customers that had purchased petition preparer services for $150 after February 2004, Mr. Anderson placed a yellow post-it-note on about 12 customer files that would be due a $70 refund.  Because Mr. Anderson was leaving the business, however, Mr. Anderson did not follow-up on issuing any refunds.  Neither Mses. Lowery nor Langford received a $70 refund when they returned to the Store for their transcribed and typed bankruptcy petitions, which did not occur until August or September 2004.  On November 9, 2004, the Bankruptcy Administrator filed its motion in Ms. Lowery's bankruptcy case to determine the propriety of petition preparer services.  The BA cited to, <u>inter alia</u>, the $80/$150 discrepancy between what was charged and what was stated to have been charged.  On November 17, 2004, Derek Distenfield mailed a $70 check to both Mses. Lowery and Langford explaining that "[t]here was a change in

[WTP's] pricing structure."

Both Mses. Lowery and Langford received their Chapter 7 discharge and neither was dissatisfied with their purchase of the Store's bankruptcy petition preparer services.

ANALYSIS

The BA contends that Messrs. Anderson, Smith, Ms. Jones, and the Franchisor are bankruptcy petition preparers subject to section 110 of the Bankruptcy Code.  The BA also alleges that Mr. Smith and Ms. Jones submitted false declarations of compensation, and that the alleged petition preparers committed numerous fraudulent, unfair, or deceptive acts, all of which warrant certification to the district court.  Based on the facts of these cases and WTP's pattern of behavior, the BA argues that an injunction is appropriate to prevent WTP from performing future bankruptcy petition preparer services.

A. Jurisdiction

WTP contends that these proceedings are non-core, meaning that this Court is limited to submitting proposed findings of fact and conclusions of law to the district court and that any final order is to be entered by the district judge.  28 U.S.C. § 157(c)(1). The Court disagrees.

Congress granted to the federal district courts original and exclusive jurisdiction of all cases under the Bankruptcy Code and original, but non-exclusive, jurisdiction over all civil

proceedings arising under, arising in, or related to a bankruptcy case.  28 U.S.C. § 1334.  The district courts have delegated this grant of jurisdiction to the bankruptcy courts. § 157(a).   In short, controversies "arise in" the Bankruptcy Code when they "have no existence outside of the bankruptcy."  United States Tr. v. Gryphon at the Stone Mansion, Inc., 166 F.3d 552, 555 (3d Cir. 1999).  Claims "arise under" the Bankruptcy Code if the claims "clearly invoke substantive rights created by bankruptcy law." Glinka v. Federal Plastics Mfg., Ltd. (In re Housecraft Indus. USA, Inc.), 310 F.3d 64, 70 (2d Cir. 2002).  A proceeding is "related to" a bankruptcy case when the resolution of the proceeding could conceivably have an effect on the bankruptcy estate.  Belcufine v. Aloe, 112 F.3d 633, 636 (3d Cir. 1997); Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984).  A court has jurisdiction over a motion to determine the propriety of petition preparer services under section 110 of the Bankruptcy Code because that is a right that "arises under" the Bankruptcy Code.  E.g., Martini v. We The People Forms & Serv. Ctr. USA, Inc. (In re Barcelo), 313 B.R. 135, 138 (Bankr. S.D.N.Y. 2004) ("The Adversary Proceeding was commenced pursuant to Section 110 of the Bankruptcy Code, and therefore arises under the Bankruptcy Code . . . ."); Robiner v. Home Owners Rescue Serv. (In re Webb), 227 B.R. 494, 497 (Bankr. S.D. Ohio 1998) ("The alleged violations of 11 U.S.C. § 110 fall squarely in this Court's jurisdiction since the cause of action is created by

the Bankruptcy Code and thus, 'arises under' title 11.").

Once the jurisdictional basis for a bankruptcy court to hear a matter is determined, the jurisdictional basis is further refined into "core" and "non-core" proceedings. In general terms, core proceedings depend on the Bankruptcy Code for their existence and either "arise in" or "arise under" the Bankruptcy Code. E.g., Dunmore v. United States, 358 F.3d 1107, 1114-5 (9th Cir. 2004) ("We determine Dunmore's claims to be 'non-core' proceedings if they do not depend on the Bankruptcy Code for their existence and they could proceed in another court."); Mich. Empl. Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1144 (6th Cir. 1991) ("'[S]ection 157 apparently equates core proceedings with the categories of 'arising under' and 'arising in' proceedings.'") (citation omitted), cert. dismissed 503 U.S. 978 (1992). Section 157(b)(2) of title 28 provides a non-exclusive list of "core" proceedings, which includes matters concerning the administration of the estate. 28 U.S.C. § 157(b)(2)(A). A motion to determine the propriety of petition preparer services is a "core" matter because it "arises under" the Bankruptcy Code and because it concerns the administration of the estate. E.g., Womack v. United States Tr. (In re Garrison), No. 98-2714, 2000 U.S. App. LEXIS 3833 at *5-6 (8th Cir. March 15, 2000) (holding that a proceeding against a petition preparer was a core matter because it concerned the administration of the estate); In re Lazarus, No. 05-

10

80274, 2005 Bankr. LEXIS 1093 at *2 (Bankr. M.D.N.C. March 14, 2005) (stating that determining the propriety of petition preparer services was a core proceeding); <u>McDow v. We the People Forms & Serv. Ctrs., Inc. (In re Douglas)</u>, 304 B.R. 223, 232 (Bankr. D. Md. 2003) ("There can be no more fundamental exercise of core subject matter jurisdiction by the bankruptcy court than its policing of professionals whom debtors pay to render services in connection with their cases.").

<u>B. Bankruptcy Petition Preparers</u>

The BA alleges that Messrs. Anderson, Smith, Ms. Jones, and the Franchisor are bankruptcy petition preparers subject to section 110 of the Bankruptcy Code.

Section 110(a) defines a bankruptcy petition preparer to be "a person, other than an attorney or an employee of an attorney, who prepares for compensation a document for filing . . . ." 11 U.S.C. § 110(a)(1). Section 101(41) includes a corporation within the meaning of the term "person."

The evidence presented at the hearings in these cases establish that Mr. Anderson accepted payments from Mses. Lowery and Langford to prepare their bankruptcy filings, that Mr. Anderson reviewed their Workbooks once they were brought back to the Store, and that Mr. Anderson retained an ownership interest in the franchise sold to Ira Distenfield, which became We The People of Raleigh, NC, Inc. The evidence also established that part of the

11

price the Store charged went to the Franchisor, who paid Ms. Jones
to transcribe and type the bankruptcy documents for filing, and to
Mr. Smith, who was an employee of the Franchisor, and who was
thereby compensated for helping to prepare Mses. Lowery's and
Langford's bankruptcy filings.  Therefore, the Court concludes,
consistent with the BA's allegations, that Messrs. Anderson, Smith,
Ms. Jones, and the Franchisor are all bankruptcy petition preparers
subject to section 110 of the Bankruptcy Code.  E.g., Moore, 290
B.R. at 294 ("It is the employees of We the People USA who actually
complete the official forms, and Mr. Anderson remits 25% of the
fees he collects from his customers to We the People USA.  We the
People USA clearly falls within the statutory definition of
bankruptcy petition preparer."); In re Sedenquist, No. 02-00045,
2003 Bankr. LEXIS 2030 at *3 (Bankr. D. Alaska March 17, 2003)
("Nothing in § 110(a) requires direct payment to a BPP from a
debtor.").

C. False Declarations of Compensation

The BA asserts that Mr. Smith and Ms. Jones submitted a false
declaration of compensation in violation of section 110(h)(1) when
they represented that Mses. Lowery and Langford were only charged
$80 for bankruptcy petition preparer services when they were
actually charged $150.[6]

_____

[6] The BA also asserts that Mr. Smith's act of placing a date
by Ms. Jones's name violates section 110(h)(1) and that Ms. Jones
violated section 110(h)(1) by signing the declaration at a time

Section 110(h)(1) of the Bankruptcy Code provides that "a bankruptcy petition preparer shall file a declaration under penalty of perjury disclosing any fee received from or on behalf of the debtor within 12 months immediately prior to the filing of the case, and any unpaid fee charged to the debtor."   11 U.S.C. § 110(h)(1).

In fact, the declaration submitted by Mr. Smith and Ms. Jones was false – Mses. Lowery and Langford each paid $150 and not the $80 as represented in the declaration.   Therefore, Mr. Smith and Ms. Jones violated section 110(h)(1) because they did not disclose the fees received from Mses. Lowery and Langford.   However, no fines are appropriate under subsection (h)(1) for submitting a false declaration. E.g., In re Walker, 257 B.R. 493, 496 (Bankr. N.D. Ohio 2001) ("The remedy for violating § 110(h)(1) is to disallow and order turnover of any fee exceeding the value of the services rendered."); In re Heck, No. 00-12048, 2000 Bankr. LEXIS 1803 at *5 (Bankr. D.N.H. Nov. 28, 2000)("After an examination of section 110, the Court finds that . . . . [n]o fine may be imposed for failure to timely file the disclosure required by section 110(h)(1)."); In re Ali, 230 B.R. 477, 483 (Bankr. E.D.N.Y. 1999)

_____

when all the district designation names, addresses, and Social Security numbers had not been completed on the declaration. However, section 110(h)(1) only concerns fees received by the bankruptcy petition preparer from or on behalf of a debtor within the preceding 12 months; these additional acts complained of by the BA do not fall within the scope of section 110(h)(1).

("The fine for a violation of section 110(h)(1) may be imposed only if the preparer fails to make a refund [of fees found to be excessive] within 30 days after a court directive to do so."). Violations of section 110(h)(1) that do not involve excessive fees are sanctionable under section 110(i)(1). E.g., Heck, 2000 Bankr. LEXIS 1803 at *5-6 ("The only method for the UST to pursue sanctions [for section 110(h)(1) violations] would be for this Court to certify a violation of section 110 to the district court pursuant to section 110(i)(1).").

D. Excessive Fees

The BA asserts that the $150 price the Store charged for bankruptcy petition preparer services is excessive, that the proper benchmark for valuing petition preparer services is what a professional typist would charge, and that the reasonable value of the services provided in each of these cases does not exceed $80 and is best indicated by what the Store paid to Ms. Jones and/or the Franchisor to transcribe and type the petitions – $37.50 each.

WTP argues that the effective fee for Ms. Lowery and Langford was $80 after WTP voluntarily issued each a $70 check due to a change in WTP's pricing structure. Even considering the standard of what a typist would charge, WTP argues that a reasonable fee in these cases would be $120 and that the wholesale price that the Store pays for Ms. Jones's services is not an indication of

reasonable value.[7]

Section 110(h)(2) of the Bankruptcy Code provides that "[t]he court shall disallow and order the immediate turnover to the bankruptcy trustee of any fee . . . found to be in excess of the value of services rendered for the documents prepared." 11 U.S.C. § 110(h)(2). The burden of proving the reasonableness of a fee collected by a bankruptcy petition preparer rests on the petition preparer. E.g., In re Froehlich, 23 Fed. Appx. 572, 574 (7th Cir. 2001) (stating that a petition preparer, as the party seeking fees, "has the burden of establishing that he or she is entitled to them once a question regarding their reasonableness has been raised."); In re Haney, 284 B.R. 841, 850 (Bankr. N.D. Ohio 2002) ("[T]he court finds that it is Mr. Harris' burden to prove the reasonableness of his fees."). This Court has previously held in a similar case involving Mr. Anderson that the reasonable value of his bankruptcy petition services was $80:

> In arriving at this finding, the court has taken into account that both of these cases are the type of routine cases commonly referred to as 'no asset' cases in which the debtors have no real property, very little personal property and the debts are not unusual in either number or kind which minimizes the typing required in order to prepare the necessary forms. The court also has taken into account the fact that all of the typing was handled in Nevada by We The People USA at a cost to Mr. Anderson

---

[7] Under 11 U.S.C. § 110(h)(1), as amended by the BAPCPA, the Supreme Court may promulgate rules, or the Judicial Conference of the United States may proscribe guidelines, for setting a maximum allowable fee chargeable by a bankruptcy petition preparer. To date, no rule or guideline exists setting the allowable fee.

that did not exceed $50.00 per case.  Mr. Anderson's
involvement in the process was rather limited, involving
the initial meeting with the Debtors, providing the
workbook and other documents to the Debtors, receipt of
the workbook after it was completed, proofreading the
workbook for completeness, faxing the workbook to Nevada,
receipt of the typed documents by electronic mail, review
of the typed documents, making hard copies of the
documents and arranging for the Debtors to pickup the
documents.

Graham, 2004 Bankr. LEXIS 1678 at *29 (footnote omitted).

Because there is no documentary evidence or testimony in these
cases relative to the reasonable value of the Store's bankruptcy
petition preparer services, the Court finds that WTP has failed to
carry its burden of proof on establishing the reasonableness of its
$150 fee.  The process for Mses. Lowery and Langford was nearly
identical to that presented to the Court in Graham.  Both of these
cases were "no asset" cases in which the debtors have little real
property, very little personal property, and the debts are not
unusual in either number or kind, which minimizes the typing
required in order to prepare the necessary forms.  Being presented
with no reason to depart from this Court's earlier precedent in
Graham, the Court concludes that a reasonable value of the services
is $80.[8]

---

[8] WTP asserts that because the parties agreed to allow the
Court to take judicial notice of the Graham case, judicial notice
also extends to the evidence presented at the hearing in the Graham
case.  The facts that the Court has taken judicial notice of are
those set forth in the Court's memorandum opinion in the Graham
case.  If the parties also intended for the Court to take judicial
notice of the evidence presented in that case regarding the value
of the typing services WTP performs, then it was incumbent on the

16

Section 110(h)(2) requires that any excess fee be paid to the bankruptcy trustee.  The $70 excess fee held by WTP after Mses. Lowery and Langford filed their bankruptcy petitions was property of their respective bankruptcy estates.  WTP was never authorized by this Court to return the money directly to Mses. Lowery or Langford; however, the money was returned after the respective chapter 7 trustees filed their reports of no distribution, which effectively abandoned known property of the estate.  11 U.S.C. § 554.  The Court will serve a copy of this memorandum opinion on Mses. Lowery's and Langford's chapter 7 trustees, who may elect to administer the undisclosed asset to the extent that neither Mses. Lowery nor Langford claims an exemption in that $70.

E. Certification

Section 110(i)(1) of the Bankruptcy Code provides that "if a bankruptcy petition preparer violates [section 110] or commits any fraudulent, unfair, or deceptive act, the bankruptcy court shall certify that fact to the district court . . . ."  11 U.S.C. § 110(i).  In general terms a "fraudulent act" exists when there

---

parties to supply the Court with that additional information.  See Fed. R. Evid. 201(d) ("A court shall take judicial notice if requested by a party and supplied with the necessary information."); Peterson v. Rothweiler (In re Peterson), 270 B.R. 719, 728 (B.A.P. 8th Cir. 2001) (holding that when a party requests that a court take judicial notice of a case, the party has the burden of presenting the pertinent evidence to the court).  To the extent that such evidence is before the Court in this case, no reason exists here to alter the Court's previous finding that the value of the petition preparer services performed by WTP do not exceed $80.

"is conduct involving bad faith, dishonesty, a lack of integrity, or moral turpitude." Black's Law Dictionary 687 (8th ed. 2004). An "unfair act" is not specifically defined, but the word "unfair" is synonymous with inequitable, unequal and unjust, and its core meaning is "not fair, right or just." Webster's II New Riverside University Dictionary 1260 (1984). A "deceptive act" is "conduct that is likely to deceive a consumer acting reasonably under similar circumstances." Black's Law Dictionary 435 (8th ed. 2004). See also Scott v. United States (In re Doser), 412 F.3d 1056, 1063 (9th Cir. 2005) (holding that section 110(i) was not vague or overbroad). The BA has alleged that WTP violated section 110 and has engaged in numerous fraudulent, unfair, or deceptive acts. The Court will consider each in turn.

### 1.  Violation of § 110(h)(1)

Mr. Smith and Ms. Jones violated section 110(h)(1) by submitting a false declaration of compensation. Mr. Smith and Ms. Jones declared that Mses. Lowery and Langford paid only $80 for bankruptcy petition preparer services when in fact they each had paid $150. Consonant with the statutory mandate of section 110(i), this fact will be certified to the district court.

### 2.  Filing a False Declaration on Penalty of Perjury

In addition to filing an declaration of compensation that did not contain correct information, Mr. Smith declared "to the best of [his] knowledge, information and belief" that Ms. Lowery and

Langford only paid $80 for bankruptcy petition preparer services.[9] The BA contends that Mr. Smith's declaration was either fraudulent, unfair, or deceptive.

WTP argues that Mr. Smith did not commit a fraudulent, unfair, or deceptive act by signing the declaration because to the best of Mr. Smith's knowledge, information, and belief, Mses. Lowery and Langford were charged $80. More specifically, WTP asserts that Ms. Jones was the person responsible for altering the $150 to $80 in the Workbooks based on her July 2004 conversation with Mr. Anderson. Furthermore, Mr. Smith was told by Derek Distenfield that the Store would only charge customers $80 for bankruptcy petition preparer services and Mr. Smith only dealt with Mses. Lowery and Langford after they had paid their $150 and at a time when the Store was only charging $80 for bankruptcy petition preparer services.

On the other hand, the evidence reflects that Mr. Anderson told Mr. Smith that the Store had been charging $150 to customers filing in the Middle District of North Carolina when Mr. Smith first started working at the Store. Also, the Store's customer

---

[9] Ms. Jones also signed the declaration of compensation under penalty of perjury. Ms. Jones, however, was told by Mr. Anderson that the charge for all bankruptcies prepared by the Store would be $80; Ms. Jones was located out of state; Ms. Jones was not privy to the Store's books and records; and based on her conversation with Mr. Anderson, Ms. Jones had reason to believe that the $150 as stated in the Workbooks was an incorrect figure. Therefore, to the best of Ms. Jones's knowledge, information and belief, the fee charged to Mses. Lowery and Langford was $80.

intake sheet, which was kept in each customer's file, reflected that both Mses. Lowery and Langford paid $150.  Mr. Smith would have seen this intake sheet when Mses. Lowery and Langford left their completed Workbooks at the Store for processing and when they returned to pick them up for filing.  Additionally, Mr. Anderson stated that he tabbed about 12 customer files that had paid the $150 and for whom Mr. Anderson thought a refund may be due prior to either Ms. Lowery or Langford picking up their completed bankruptcy petitions.

When the BA examined Mr. Smith about his declaration of compensation, Mr. Smith testified that he affixed his vow to the disclosure of compensation without bothering to read it.  Also, Mr. Smith testified that he affixed the present date next to Ms. Jones's name on the disclosure of compensation even though Ms. Jones had affixed her signature at an earlier date.

Based on this evidence, the Court finds that to the best of Mr. Smith's knowledge, information, and belief, he knew that Mses. Lowery and Langford were charged $150 and that he knew that his declaration was false.  By falsely declaring that Mses. Lowery and Langford were only charged $80, Mr. Smith committed a fraudulent, unfair, or deceptive act.  E.g., In re Kaitangian, 218 B.R. 102, 117 (Bankr. S.D. Cal. 1998) ("[T]he intentional failure of the Filippones to disclose all fees paid by the debtors under penalty of perjury constitutes an unfair and deceptive act within the

meaning of § 110(i)(1)."). Moreover, Mr. Smith's statement that he failed to read the information that he was declaring to be true and correct to the best of his knowledge, information, and belief evidences a reckless and cavalier disregard for the gravity of the declaration that is serious enough to constitute a fraudulent act. E.g., Jordan v. Bren (In re Bren), 303 B.R. 610, 614 (B.A.P. 8th Cir. 2004) ("Such passivity and disregard for the gravity of the vow taken by affixing one's signature to the documents can constitute reckless indifference to the truth and therefore fraudulent intent."), rev'd on other grounds, 122 Fed. Appx. 285 (8th Cir. 2005).

Finally, placing a date next to Ms. Jones's name that was different from the date on which she affixed her signature was a fraudulent, unfair, or deceptive act because Mr. Smith was representing a fact to be true under penalty of perjury when he knew that fact to be untrue. See 18 U.S.C. § 1621(2) (defining perjury as willfully subscribing "as true any material matter which he does not believe to be true."). While misdating Ms. Jones's signature in this case may not have been material, it was a fraudulent, unfair, or deceptive act that the Court is required to certify to the district court. Therefore, the fact that Mr. Smith submitted a false declaration under penalty of perjury, the fact that Mr. Smith cavalierly affixed his signature to a vow that he did not read, and the fact that Mr. Smith falsely dated Ms. Jones's

signature will be certified to the district court.

        3.  Failing to Comply with Court Orders

        The BA alleges that the Franchisor and/or Mr. Anderson
committed fraudulent, unfair, or deceptive acts by failing to
timely communicate this Court's February 2004 memorandum opinion
and order in <u>Graham</u> to Mr. Anderson until July 2004, by Mr.
Anderson's failure to read the complete <u>Graham</u> decision, by
continuing to charge $150 for bankruptcy petition preparer services
after February 2004, by advertising that the fee charged for
bankruptcy petition preparer services was $150 until March 2005,
and by failing to timely pay the sanctions imposed in <u>Graham</u> until
July 2005.

        The Court's opinion in <u>Graham</u>, to which Mr. Anderson and We
The People Document Services were party, specifically declined to
grant any injunctive relief.  The <u>Graham</u> decision only concerned
the cases and issues before the Court at that time, and apart from
the ordinary weight of stare decisis[10] that is given to this Court's
opinions, nothing in the Court's decision in <u>Graham</u> was to be given
prospective effect.  Because the bankruptcy petition preparer
services in these cases are substantially identical to those
presented in <u>Graham</u>, the Court has ordered the return of $70 of the

---

        [10] Stare decisis is "[t]he doctrine of precedent, under which
it is necessary for a court to follow earlier judicial decisions
when the same points arise again in litigation."  <u>Black's Law
Dictionary</u> 1443 (8th ed. 2004).

22

$150 fee as being excessive.  This does not mean, however, that $80 is the maximum that WTP may charge for bankruptcy petition preparer services in all cases.  Consequently, neither failing to charge all customers who bought the Store's bankruptcy petition preparer services $80 after the Court's February 2004 decision in <u>Graham</u>, nor advertising the Store's bankruptcy petition services for $80/$150, is a fraudulent, unfair, or deceptive act.

Likewise, the Court does not find that the Franchisor's failure to timely communicate the Court's decision in <u>Graham</u>, Anderson's failure to read the <u>Graham</u> decision in its entirety, or failing to promptly pay the sanctions set in <u>Graham</u> are fraudulent, unfair, or deceptive acts under section 110(i)(1).  WTP appealed this Court's decision in <u>Graham</u>, and that decision was not affirmed on appeal until April 2005.  Under the circumstances, the failure of WTP to timely communicate the <u>Graham</u> decision to Mr. Anderson in a timely manner is not fraudulent, unfair, or deceptive. Similarly, while Mr. Anderson's failure to read the <u>Graham</u> decision in its entirety and his failure to timely pay court ordered sanctions might have been foolish, those are not acts that require certification to the district court.

### 4.  Marionette

The BA alleges that the Franchisor committed a fraudulent, unfair, or deceptive act by falsely portraying Mr. Anderson as the bankruptcy preparer when in fact the Franchisor was controlling the

Store.

The Court has already determined that the Franchisor is a petition preparer within the meaning of the statute, and in fact, Ms. Jones signed on behalf of the Franchisor as the bankruptcy petition preparer. The Court does not find it to be a fraudulent, unfair, or deceptive act to outsource document transcription and typing work and no evidence was presented that such outsourcing was concealed from Store customers or that customers were deceived into believing that Mr. Anderson would personally prepare their bankruptcy petitions. Therefore, the Court does not find any merit in the BA's allegation that the Franchisor committed a fraudulent, unfair, or deceptive act by allegedly "controlling" the Store.

### 5.  Misleading Advertisements

The BA argues that WTP's documents and advertisements are fraudulent, unfair, or deceptive on the grounds that they mislead consumers into believing that they can get the same or sufficient information and assistance from WTP for $80 to $150 that the consumer could get from an attorney. The BA asserts that WTP's documents and advertisements creates the impression that WTP offers a safety net or value added service beyond that of mere typing.

Section 110(f) of the Bankruptcy Code provides a prohibition on bankruptcy petition preparers from using the word "legal" or any similar term in any advertisement. WTP's advertisement in this case provided that the price for bankruptcy petition preparer

24

services was $80/$150 and contained the statement, "No lawyers save money."  The Court has previously addressed similar advertisements prepared by WTP and has held that the term "'lawyer' is not used in a manner that suggests that Mr. Anderson is a lawyer or is acting as a lawyer or providing 'legal' services such as would be provided by a lawyer."  Graham, 2004 Bankr. LEXIS at *19.  Likewise, the Court does not find that the advertisements in these cases offend section 110(f), or that they create an impression that WTP can offer a consumer a safety net or a value added service beyond that of mere typing.  In fact, the message of the advertisement is that there are no lawyers; hence, no one exists to provide legal advice. As explained in the following section, however, the documents that WTP offers to Store customers that seek their bankruptcy petition services are fraudulent, unfair, or deceptive because they constitute the unauthorized practice of law.

### 6.  Unauthorized Practice of Law

The BA alleges that WTP engaged in the unauthorized practice of law by providing bankruptcy petition preparer services to Mses. Lowery and Langford, which is a fraudulent, unfair, or deceptive act under section 110(i)(1).  E.g., Lazarus, 2005 Bankr. LEXIS 1093 at *14-15 ("[T]he courts have concluded that if a petition preparer engages in the unauthorized practice of law in dealing with bankruptcy debtors, the petition preparer thereby commits an act that is fraudulent, unfair and deceptive for purposes of

25

§ 110(i).").

WTP argues that under the Bankruptcy Abuse Prevention Consumer Protection Act of 2005 ("BAPCPA"), Congress now allows bankruptcy petition preparers to engage in some conduct that might otherwise constitute the unauthorized practice of law by making bankruptcy petition preparers subject to section 527 of the Bankruptcy Code. Thus, even if its practices had constituted the unauthorized practice of law before the enactment of the BAPCPA, WTP contends that it should not be held accountable for acts that it is purportedly required to perform.

When an intervening change in the law occurs that legalizes certain activity that was formerly proscribed, courts are directed not to impose sanctions for the formerly wrongful act. E.g., Bell v. Maryland, 378 U.S. 226, 230 (1964) ("[W]hen the legislature repeals a criminal statute or otherwise removes the State's condemnation from conduct that was formerly deemed criminal, this action requires the dismissal of a pending criminal proceeding charging such conduct.  The rule applies to any such proceeding which, at the time of the supervening legislation, has not yet reached final disposition in the highest court authorized to review it."); United States v. Chambers, 291 U.S. 217, 226 (1934) ("Prosecution for crimes is but an application or enforcement of the law, and if the prosecution continues the law must continue to vivify it."); United States v. Heinszen & Co., 206 U.S. 370, 384

(1907) (holding that Congress "has the power to ratify the acts which it might have authorized" in the first place, so long as the ratification "does not interfere with intervening rights."); Thomas v. Network Solutions, 176 F.3d 500, 507 (D.C. Cir. 1999) (assuming that an act was civilly illegal when it occurred and then affirming the dismissal of the case after Congress passed legislation that legalized the act), cert. denied 528 U.S. 1115 (2000).

The federal savings statute of 1 U.S.C. § 109 is generally considered not to apply to the dismissal of a case due to the legalization of previously proscribed acts because section 109 "was meant to obviate mere technical abatement" where, for example, there is an enactment of a greater schedule of penalties that would otherwise apply to previous prosecution. Hamm v. Rock Hill, 379 U.S. 306, 314 (1964), cf. Pipefitters Local Union v. United States, 407 U.S. 385, 434-35 (1972) (holding that 1 U.S.C. § 109 applies so long as the basic offense is maintained and there is no substitution of "a right for a crime."). Accordingly, if sanctions for an act no longer serves any legislative purpose, then imposing sanctions "would be unnecessarily vindictive." Hamm, 379 U.S. at 313.

WTP argues that four new subsections in the Bankruptcy Code, taken together, prohibit the Court from finding it engaged in the unauthorized practice of law. First, Congress has deemed a bankruptcy petition preparer to be a "debt relief agency" because

27

bankruptcy petition preparers "provide bankruptcy assistance to an assisted person in return for the payment of money . . . ."  11 U.S.C. § 101(12)(A).  Second, as a "debt relief agency," bankruptcy petition preparers have new obligations, including those found in section 527(c) of the Bankruptcy Code:

> [A] debt relief agency providing bankruptcy assistance to an assisted person, to the extent permitted by nonbankruptcy law, shall provide each assisted person . . . reasonably sufficient information . . . on how to provide all the information the assisted person is required to provide under this title pursuant to section 521, including--
> (1) how to value assets at replacement value, determine current monthly income, the amounts specified in section 707(b)(2) and, in a chapter 13 case, how to determine disposable income in accordance with section 707(b)(2) and related calculations;
> (2) how to complete the list of creditors, including how to determine what amount is owed and what address for the creditor should be shown; and
> (3) how to determine what property is exempt and how to value exempt property at replacement value as defined in section 506.

§ 527(c).

Third, in section 527(a)(1), the BAPCPA amendments require debt relief agencies to provide the written notices required by section 342(b)(1), which directs the clerk to give to individuals a written notice containing a brief description of chapters 7, 11, 12, and 13, as well as the general purpose, benefits, and costs of proceeding under each of those chapters.  Fourth, section 527(a)(2) requires that a bankruptcy petition preparer give a notice that:

> (A) all information that the assisted person is required to provide with a petition and thereafter during a case under this title is required to be complete, accurate,

28

and truthful;

(B) all assets and all liabilities are required to be completely and accurately disclosed in the documents filed to commence the case, and the replacement value of each asset as defined in section 506 must be stated in those documents where requested after reasonable inquiry to establish such value;

(C) current monthly income, the amounts specified in section 707(b)(2), and, in a case under chapter 13 of this title, disposable income (determined in accordance with section 707(b)(2), are required to be stated after reasonable inquiry; and

(D) information that an assisted person provides during their case may be audited pursuant to this title, and that failure to provide such information may result in dismissal of the case under this title or other sanction, including a criminal sanction.

§ 527(a)(2).

Nothing in these provisions, however, was intended to displace relevant state law dealing with the unauthorized practice of law or to grant petition preparers carte blanche authority to engage in the unauthorized practice of law.   The Court reaches this conclusion for four reasons.

First, section 527(c) only allows a debt relief agency to assist a bankruptcy debtor "to the extent permitted by nonbankruptcy law."   Indeed, it is difficult to conceive that any State would allow a non-lawyer to assist a potential bankruptcy debtor perform such acts as how to determine what property is exempt.   E.g., Taub v. Weber, 366 F.3d 966, 971 (9th Cir. 2004) ("Taub's determination regarding the meaning of the terms "market value" and "secured claim or exemption" crossed the line laid down by the Oregon Supreme Court.").   Thus, if not permitted under State

law, Congress did not authorize bankruptcy petition preparers to undertake any of the activities listed in 11 U.S.C. § 527(c).

Second, new section 110(e)(2) contains express prohibitions on the rendering of legal advice concerning, <u>inter</u> <u>alia</u>, how to characterize a potential bankruptcy debtor's interests or debts, or advice on bankruptcy procedures or rights.  Also, the BAPCPA left section 110(k) of the Bankruptcy Code unchanged.  That section provides that noting in section 110 is to "be construed to permit activities that are otherwise proscribed by law, including rules and laws that prohibit the unauthorized practice of law." § 110(k).

Third, to the extent that section 527 does authorize bankruptcy petition preparers to engage in acts that constitute the practice of law as proscribed by state law, that authorization is to be construed narrowly.  § 526(d)(1) (altering state law only to the extent inconsistent with sections 526, 527 and 528).

Fourth, to the extent that the amendments to the Bankruptcy Code under the BAPCPA authorize bankruptcy petition preparers to provide general information on chapter 7, 11, 12, and 13, or to provide notice about the need for complete and accurate disclosures, WTP's conduct in these cases far exceed what is now authorized by Congress.

WTP's conduct therefore is to be reviewed by using North Carolina law as the benchmark for determining whether WTP engaged

30

in a fraudulent, unfair, or deceptive act by engaging in the unauthorized proactive of law. E.g., Taub, 366 F.3d at 968 (9th Cir. 2004) ("Bankruptcy courts generally look to state law for guidance when determining whether a person has engaged in the unauthorized practice of law."); In re Merritt Dredging Co., 839 F.2d 203, 205 (4th Cir.) ("Although bankruptcy cases involve federal statutes and federal questions, a bankruptcy court may, as here, face situations in which the applicable federal law incorporates matters which are the subject of state law. It is clear that a federal court in such cases must apply state law to the underlying substantive state law questions."), cert. denied, 487 U.S. 1236 (1988); Graham, 2004 Bankr. LEXIS at *23 ("Mr. Anderson's contention that the court may not consider state law pertaining to the unauthorized practice of law in dealing with cases arising under § 110 is rejected. Section 110(k) specifically provides that 'nothing in this section shall be construed to permit activities that are otherwise prohibited by law, including rules and laws that prohibit the unauthorized practice of law.'").

Under North Carolina law, persons other than members of the North Carolina State Bar are prohibited from practicing law. N.C. Gen. Stat. § 84-4. A person who engages in the unauthorized practice of law is subject to criminal prosecution for a class 1 misdemeanor. § 84-8. The practice of law specifically includes performing any legal service for another person, preparing

petitions, or assisting by advice, counsel, or otherwise in any legal work. § 84-2.1.[11]  This Court has adopted the following reasoning regarding what is permissible for a scrivener and what constitutes the unauthorized practice of law for bankruptcy petition preparers:

> The type of compensable services that a bankruptcy petition preparer can render are extremely limited. Petition preparers, who by definition are not attorneys, cannot give legal advice or otherwise engage in the unauthorized practice of law . . . .  Clearly, as recognized by the District Court, a bankruptcy petition preparer cannot assist the debtor in completing forms, provide legal advice that would assist a prospective debtor in making determinations as to which type of

---

[11] The statute provides:
The phrase "practice law" as used in this Chapter is defined to be performing any legal service for any other person, firm or corporation, with or without compensation, specifically including the preparation or aiding in the preparation of deeds, mortgages, wills, trust instruments, inventories, accounts or reports of guardians, trustees, administrators or executors, or preparing or aiding in the preparation of any petitions or orders in any probate or court proceeding; abstracting or passing upon titles, the preparation and filing of petitions for use in any court, including administrative tribunals and other judicial or quasi-judicial bodies, or assisting by advice, counsel, or otherwise in any legal work; and to advise or give opinion upon the legal rights of any person, firm or corporation: Provided, that the above reference to particular acts which are specifically included within the definition of the phrase "practice law" shall not be construed to limit the foregoing general definition of the term, but shall be construed to include the foregoing particular acts, as well as all other acts within the general definition. The phrase "practice law" does not encompass the writing of memoranda of understanding or other mediation summaries by mediators at community mediation centers authorized by G.S. 7A-38.5.
N.C. Gen. Stat. § 84-2.1.

> bankruptcy to file or which exemptions to take, or direct
> clients to particular legal publications or specific
> pages so that they can attempt to find legal answers on
> their own.  The very act of directing a prospective
> debtor to review a particular section of a legal book in
> and of itself constitutes legal advice.  By focusing on
> one answer and excluding others, the bankruptcy petition
> preparer steps over the line.  As stated by the District
> Court, "Legal advice is legal advice, whether it comes
> directly from the petition preparer or indirectly via,
> for example, a bankruptcy treatise being recited by that
> preparer. . . ."

Graham, 2004 Bankr. LEXIS at * 24-25 (quoting Meininger v.
Burnworth (In re Landry), 268 B.R. 301, 304 (Bankr. M.D. Fla. 2001)
(citation omitted)).

Apart from the new notice requirements of section 527(a),
nothing in the BAPCPA alters this reasoning.  A bankruptcy petition
preparer is only authorized to meet a prospective debtor, make the
required disclosures, provide the required notices, provide blank
bankruptcy forms for the debtor to complete without any assistance
from the petition preparer, type the information on the applicable
bankruptcy forms without change or alteration, copy the documents
prepared for the prospective debtor, and deliver the original and
at least one copy of the documents to the prospective debtor.
Consequently, when Mr. Anderson had used nearly the same Workbook,
Guide, and Overview in Graham as was given to Mses. Lowery and
Langford in these cases, the Court stated:

> The Workbook and Guide are intended to clarify the
> information required on the official forms for the
> petition, schedules and statement of financial affairs.
> A review of these documents reveals that they constitute
> legal advice when provided by a petition preparer to a

customer for whom bankruptcy documents are being prepared. The Workbook to be completed by the customer is not merely a blank copy of the official forms. Rather, it is a document prepared by We The People USA which, together with the Guide and Overview, contains advice to the customer concerning bankruptcy law and how the blanks in the Workbook should be completed. For example, detailed advice regarding the North Carolina exemption laws is provided in the Overview. Apart from providing legal advice, there are many inaccuracies in the documents supplied by Mr. Anderson. For example, both the Workbook and the Guide ask a debtor whether he or she wishes to "Reaffirm (keep) or Surrender (give up)" property. Not only is the parenthetical language an over simplification of the concepts of reaffirmation and surrender, they also may lead a debtor to choose incorrectly how to treat his or her property. . . . Moreover, some of the instructions in the Guide and Workbook involve interpretations that cannot be found within the Official Forms. For example, asking for the "quick sale" value of property where the Official Forms ask for "value," or limiting "animals" to "farm, not pets" where the Official Forms contain no such limitation. In addition to providing legal advice concerning how to fill out bankruptcy forms, these documents also include advice to debtors concerning other aspects of the bankruptcy process. For example, the Overview includes two pages of legal advice concerning the § 341 meeting of creditors and how to handle an abusive trustee and also gives advice for rebuilding credit after filing bankruptcy. While § 110 allows a bankruptcy petition preparer to type bankruptcy forms, it does not allow the petition preparer "to provide documents that explain bankruptcy or how to complete the required information that the preparer is then to transfer to the Official Forms." Supplying such documents as a part of the services provided by a petition preparer constitutes the unauthorized practice of law within the definition contained in the N.C.G.S. § 84-2.1. Moreover, by taking the information placed in the Workbook by the customer and entering it by computer into the Official Forms, which differ from the Workbook, Mr. Anderson and We The People cease to be mere scriveners, as allowed by § 110, and, instead, engage in "the preparation . . . of petitions for use in any court" which falls within the definition contained in N.C.G.S. § 84-2.1.

34

Graham, 2004 Bankr. LEXIS at *37-39 (citations omitted).

In these cases, the Guide and Overview have been slightly altered from the ones before the Court in Graham, however, the Court's analysis remains unchanged.  For example, when the Official Forms require the "current market value" of property to be stated, the Guide instructs a Store customer to value household goods at a "pawnshop value or yard sale value."  Likewise, the Guide and Workbook in these cases also oversimplify the concepts of reaffirmation and surrender by asking a debtor whether he or she wishes to "Reaffirm (keep) or Surrender (give up)" property.  The Overview also contains legal advice on what to expect during the section 341 meeting of creditors, how to handle an abusive trustee, and how to rebuild credit after filing bankruptcy.  Furthermore, the Workbook is not the same as the Official Bankruptcy Forms which are used to file a case; thus, by transcribing the information in the Workbook onto the Official Forms, WTP is creating the petition – not merely typing it.  Accordingly, the Court will certify the fact that Messrs. Anderson, Smith, Ms. Jones, and the Franchisor have engaged in the unauthorized practice of law to the district court.

### 7.  Continuing Violations

The BA also alleges that WTP engaged in a continuing violation of section 110 by failing to correct the false disclosures of compensation, failing to promptly return $70 to Mses. Lowery and

Langford, and by continuing to use the Workbook, Overview and Guide after February 2004.

To prove a continuing violation, a party must show that the damage inflicted is "'reasonably abatable,'" meaning that the offending condition can be removed "'without unreasonable hardship or expense.'" Skokomish Indian Tribe v. United States, 401 F.3d 979, 991 (9th Cir.) (citation omitted), amended at 410 F.3d 506 (9th Cir.), cert. filed, No. 01-35028 (Oct. 3, 2005). For a violation to be continual, the violation must be "'occasioned by continual unlawful acts, not continual ill effects from an original violation.'" Ocean Acres Ltd. Partnership v. Dare County Bd. of Health, 707 F.2d 103, 106 (4th Cir. 1983) (citation omitted). Thus, for a continual violation to occur, there must be some additional conduct that causes harm. E.g., Cowell v. Palmer Twp., 263 F.3d 286, 293 (3d Cir. 2001) (holding that the imposition of liens on property in alleged violation of the Fourteenth Amendment was not a continuing violation such that the statute of limitations would not run until the liens were lifted or expunged); National Advertising Co. v. Raleigh, 947 F.2d 1158, 1166 (4th Cir. 1991) ("[W]hat continued was the ill effect of the ordinance's enactment and the alleged taking. No continuing unlawful acts have been shown."), cert. denied, 504 U.S. 931 (1992).

Submitting false disclosures of compensation regarding the amount Mses. Lowery and Langford paid to the Store for bankruptcy

36

petition preparer services is a single unlawful act.  It is not a continuing violation because there was no additional conduct that caused harm, and after the wrongful act occurred there was no additional damage that could be abated.  For the same reasons, the Court finds no continuing violation in failing to remit $70 to Mses. Lowery and Langford in a more timely manner.

Using the Workbook, Guide, and Overview after February 2004, however, is a continuing violation of section 110(i)(1).  Mr. Anderson testified that between February 2004 and July 2004, there were about twelve Store customers who bought bankruptcy petition preparer services and who filed in the Middle District of North Carolina.  The Workbook, Guide, and Overview were given to all of the Store's customers before Mr. Anderson sold the franchise and the Franchisor discontinued the use of the Overview and Guide.  The offense – committing the unauthorized practice of law – was reasonably abatable because the use of the Workbook, Guide and Overview could be discontinued without unreasonable hardship or expense.  Thus, the fact that WTP repeatedly engaged in the unauthorized practice of law between February 2004 and July 2004 will be certified to the district court.

F. Injunction

The BA seeks an injunction prohibiting WTP from providing bankruptcy petition preparer services because WTP has engaged in fraudulent, unfair, or deceptive conduct.

A bankruptcy court may issue an order enjoining a bankruptcy petition preparer from further acting as a bankruptcy petition preparer if the bankruptcy petition preparer has engaged in conduct in violation of section 110 that subjects a person to a criminal penalty, or if the bankruptcy petition preparer engaged in other fraudulent, unfair, or deceptive conduct. 11 U.S.C. § 110(j)(2)(i). Importantly, injunctive relief must be appropriate to prevent the reoccurrence of the proscribed conduct. § 110(j)(2)(ii). For example, injunctive relief would be appropriate to suppress the unauthorized practice of law. E.g., United States Tr. v. Costello (In re Rankin), 320 B.R. 171, 186 (Bankr. D. Mont. 2005) ("Her unauthorized practice of law and refusal to comply with the other requirements of § 110 . . . constitute a sufficient showing for this Court to conclude . . . that a permanent injunction against Costello should be issued . . . .").

In these cases, however, the BA has not made a sufficient showing to enjoin any of the bankruptcy petition preparers from providing bankruptcy petition preparer services. Mr. Anderson testified that WTP only charges Store customers filing in the Middle District of North Carolina $80 beginning in July 2004. Also, Mr. Smith testified that WTP no longer uses the Overview or Guide; rather WTP now issues potential bankruptcy debtors a pamphlet prepared by the Administrative Office of the United States

Courts.

The Store's continued use of the Workbook is more troubling, however, considering that this Court found that the use of the Workbook itself constituted the unauthorized practice of law in Graham on February 13, 2004.[12]  The Workbook is not merely a blank copy of the Official Forms; rather, it is prepared by WTP, it contains advice on how to fill out the relevant sections of the Workbook, and when WTP transcribes the information a customer provides in the Workbook to the Official Forms, which differ from the Workbook, WTP engages in the preparation of a petition, which is prohibited by N.C. Gen. Stat. § 84-2.1.  This is the second time that WTP's use of the Workbook has come before this Court, and the second time that the Court has found that WTP's use of the Workbook constitutes the unauthorized practice of law.  Under the totality of the circumstances, the Court finds that an injunction against WTP's further use of the Workbook in this District is appropriate.

CONCLUSION

The Court finds that Mr. Smith and Ms. Jones violated section 110(h)(1) by submitting a false bankruptcy petition preparer disclosure of compensation.  The Court also finds that Mr. Smith, Mr. Anderson, Ms. Jones, and/or the Franchisor engaged in fraudulent, unfair, or deceptive acts that must be certified to the

---

[12] The Court's decision in Graham was not affirmed on appeal until April 14, 2005, and the Store's use of the Workbook in these cases occurred while the Graham decision was on appeal.

district court for further proceedings.  The Court will enjoin WTP from further using the Workbook to assist customers who file for bankruptcy in this District.

A separate Order will be issued contemporaneously herewith pursuant to Fed. R. Bankr. P. 9021.

_____Parties to be Served


Joanne P. Underhill, Esq.
5340 S. Quebec Street
Suite 306 North
Greenwood Village, CO 80111

Clarence D. Smith, Jr.
c/o We The People Document Services
4949-C Capital Blvd.
Raleigh, NC 27616

Ms. Marilyn Jones
c/o We The People USA
1501 State Street
Santa Barbara, CA 93101

Jason Searns, Esq.
WTP Forms & Service Centers USA, Inc.
5655 Yosemite Street, Suite 203
Greenwood Village, CO 80111

Leonard G. Green, Asst. Aty. General
Harriet F. Worley, Asst. Aty. General
P.O. Box 629
Raleigh, NC 27602-0629

Michael D. West, Bankruptcy Administrator